**UNITED STATES**

v.

**Robert B. OGREN, Seaman Recruit (E–1), U.S. Navy.**

**NMCM 99 00041.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 16 Nov. 1998.

Decided 29 Oct. 1999.

LCDR Linda J. Lofton, JAGC, USN, Appellate Defense Counsel.

LCDR Patricia M. Sulzbach, JAGC, USNR, Appellate Defense Counsel.

LCDR Paul D. Lochner, JAGC, USNR, Appellate Government Counsel.

LT Kevin S. Rosenberg, JAGC, USN, Appellate Government Counsel.

Before DORMAN, Senior Judge, TROIDL, Senior Judge, and ROLPH, Appellate Military Judge.

ROLPH, Judge:

In this mixed plea case before a military judge, sitting alone as a general court-martial, the appellant was convicted, in accordance with his pleas, of two specifications of using disrespectful language to senior petty officers, one specification of disobeying the lawful order of a chief petty officer, one specification of willfully damaging military property, and one specification of assault consummated by a battery, in violation of Articles 91, 108, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 891, 908, and 928 (1994). Contrary to his pleas, the appellant was also convicted of a third specification of disrespect to a petty officer, one specification of communicating a threat, and one specification of communicating a threat to harm the President of the United States [1] in violation of Articles 91 and 134, UCMJ, 10 U.S.C. §§ 891 and 934. The appellant was sentenced to confinement for 12 months, reduction to E–1, total forfeiture of pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed. Pursuant to the terms of the appellant's pretrial agreement, the convening authority suspended all confinement in excess of 200 days for a period of 12 months from the date of trial.

We have carefully examined the record of trial, the appellant's four assignments of error, and the Government's response. We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to appellant's substantial rights was committed. Arts. 59(a) and 66(c), UCMJ.

## Facts

As a result of his multiple incidents of disruptive misconduct, including assault and battery upon a fellow Sailor, the appellant

---

1. In violation of 18 U.S.C. § 871(a)(1994), as assimilated under Article 134, UCMJ.

was placed in pretrial confinement on 25 June 1998, at the Pretrial Confinement Facility located at the Naval Training Center (NTC), Great Lakes, IL. Record at 77, 84; Charge Sheet. The Government established, and the defense readily conceded, that the appellant was an abusive, antagonistic, and disruptive pretrial confinee. On the evening of 20 July 1998, upon being subjected to a random cell search, the appellant became especially abusive and threatening towards EM2 Simona Williams, USN, a brig guard. He stated to her, "I'm going to eat your children." "I'm going to eat you, and I'm going to f—— you up." He went on to state that "the Navy locator [service] is a wonderful thing," that he would find her and her children, and that "while you're at work, I'm going to find your children and f—— them up." Record at 53–54, 60; Charge sheet. Ultimately, the appellant calmed down and went to sleep.

The following morning, on 21 July 1998, the appellant became enraged again when EM2 Williams asked him to sign a "hard card"[2] acknowledging his inappropriate behavior towards staff personnel the night before. He repeated many of the same threats to EM2 Williams that he had stated the night before, threw his breakfast all over his cell door and window, flooded his cell with water by stopping up the drain to his sink, and resisted violently when guards tried to subdue him. Ultimately, he was placed in a four-point restraining harness. Later that day, MM3(SS) Jason Lyell, USN, another brig guard, confronted the appellant about abusive comments he had made to another pretrial detainee. The appellant told MM3(SS) Lyell to "F—— off!" Record at 76. He also stated, "F—— you, f—— Chief, f—— the Admiral, and f—— the President." Record at 76, 82. He then said, "As a matter of fact, If I could get out of here right now, I would get a gun and kill that bastard!" Record at 76. MM3(SS) Lyell took the appellant's comments seriously and reported them to his leading chief petty officer, MAC Robert Sulia, USN. Record at 77.

OS2 Joseph M. Marnati, USN, also a brig guard, similarly approached the appellant that morning and asked him why he was enraged and beating on the bulkheads of his cell. The appellant responded, "I can't wait to get out of here man." OS2 Marnati inquired why, and the appellant stated, "Because I'm going to find the President, and I'm going to shove a gun up his ass, and I'm going to blow his f——ing brains out." Record at 85. OS2 Marnati asked him what President he was talking about, and the appellant responded, "Clinton, Clinton man! I'm going to find Clinton and blow his f——ing brains out." *Id.* OS2 Marnati documented the incident in the brig's log-book and notified his section leader.

Finally, MAC Robert Sulia, USN, the chief petty officer in charge of the Pretrial Confinement Facility, spoke to the appellant after he was briefed by his staff in regard to the appellant's aberrant behavior and multiple threats towards the President. The appellant acknowledged his misconduct and claimed that it was due to the brig staff being "overbearing." Record at 68–70.

The appellant's threats against the President were ultimately reported to the U.S. Secret Service Agency. On 23 July 1998, Special Agent Douglas Cohen of the Secret Service interviewed the appellant in the brig. The appellant admitted to agent Cohen that he had made a threatening statement ("something to the effect of he would get a gun and get some bullets, shove it up the President's ass, and blow his head off … or brains out."). Record at 94. When asked by Agent Cohen whether he owned any guns, the appellant replied, "no, but I can get them." *Id.* The appellant was temporarily removed to the Metropolitan Correctional Center in Chicago, IL, while his threat was investigated by the Secret Service, and he ultimately apologized for making the threat, authoring the following letter to the Clinton family:

I, Seaman Recruit Robert Ogren, on July 23rd, 1998, write this letter of apology to comments [sic] that I spoke about the

---

**2.** Apparently, a "hard card" is a counseling form utilized to document poor performance or misconduct.

President on 21 [sic] in reference to harming Mr. Clinton. I would not entertain the thought of hurting him. I hope he live [sic] a happy live [sic] with his family. May God bless the Clintons.

Defense Exhibit A; Record at 98.

## Legal and Factual Sufficiency of the Evidence Supporting Conviction for Threatening the President of the United States

In his first assignment of error, the appellant challenges both the legal and factual sufficiency of the evidence supporting his conviction under 18 U.S.C. § 871(a) (1994), as assimilated under Article 134, UCMJ, for verbally threatening the President of the United States of America. He specifically challenges his conviction on the basis that there was no evidence to establish that he made a "true threat" against President Clinton.

Although the Federal Circuit Courts have addressed 18 U.S.C. § 871 (1994) extensively, this case represents the first opportunity any military appellate court has had to interpret this federal statute, and to address the question raised by the appellant as to what constitutes a "true threat" under its provisions.

While one of the strengths of democracy lies in its willingness to tolerate and even encourage dissent, this tolerance is not without boundaries. The purpose and necessity of the "Threats Against the President" statute has regrettably become all too clear over the course of this century. Title 18 U.S.C. § 871(a) (1994), the "Threats Against the President and Successors to the Presendency" statute, specifically reads as follows:

(a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or any letter carrier, any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, *or knowingly and willfully otherwise makes any such threat against the President*, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

Emphasis added.

Originally enacted in 1917,[3] 18 U.S.C. § 871 recognizes in its terminology "that it is the making of the threat that is prohibited without regard to the maker's subjective intention to carry out the threat." *United States v. Manning,* 923 F.2d 83, 86 (8th Cir.1991). "The threat alone is disruptive of the recipient's sense of personal safety and well-being and is the true gravamen of the offense." *Manning,* 923 F.2d at 86. As was so well stated in *United States v. Stickrath,* 242 F. 151, 153 (D.C.Ohio 1917), "[t]o threaten to kill [the President] or to inflict upon him bodily harm stimulates opposition to national policies, however wise, even in most critical times, incites the hostile and evilminded to take the President's life, adds to the expense of his safeguarding, is an affront to all loyal and right-thinking persons, inflames their minds, provokes resentment, disorder, and violence, is akin to treason, and is rightly denounced as a crime against the people as the sovereign power." The statute serves to protect the President and to "preserve the tranquillity of the people and their peace of mind." *Stickrath,* 242 F. at 153.

■ This offense has two essential elements:

That the accused's words or actions constitute a true threat; and

That the accused used those words, or took those actions, knowingly and willfully.

*See United States v. Johnson,* 14 F.3d 766, 769 (2nd Cir.1994); *United States v. Rogers,* 488 F.2d 512, 514 n. 2, 3 (5th Cir.1974), *reversed on other grounds,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975).

**3.** As 18 U.S.C. § 89.

## A. A "True Threat."

The appellant asserts that the evidence is both legally and factually insufficient to establish that his statements concerning President Clinton constituted a "true threat" as required by this statute. He relies on the argument that he made his threatening statements 1) in a fit of anger, while being "antagonistic" and "venting," 2) while in confinement, and 3) never intending to actually inflict any harm upon the President. All of these factors, he claims, militate against the statement concerning President Clinton being interpreted as a "true threat." We disagree.

The test for assessing legal sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). When applying this test, we are bound to draw every reasonable inference from the record in favor of the prosecution. *United States v. McGinty,* 38 M.J. 131 (C.M.A.1993). The test for assessing factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses ... [we are] convinced of the accused's guilt beyond a reasonable doubt." *Turner,* 25 M.J. at 325. *See* Art. 66(c), UCMJ.

Under our Article 66(c), UCMJ, mandate, we may only affirm court-martial findings that are correct in law and fact, and that we determine, on the basis of the entire record, should be approved. In executing this mandate, we are given broad power to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." Art 66(c), UCMJ.

A "true threat" for purposes of this offense means *any* contextually credible threat to kill, injure, or kidnap the President (or one of his successors listed in 18 U.S.C. § 871). *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969)*(per curiam).*[4] If the accused "should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it [was] made," he may be properly convicted under this statute. *United States v. Fulmer,* 108 F.3d 1486, 1491 (1st Cir. 1997).[5] "True threats" are not protected by the First Amendment's free speech guarantees. *Watts,* 394 U.S. at 707, 89 S.Ct. 1399; *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Conversely, communications which "convey mere political hyperbole, innocuous talk, jest, or similar speech" are beyond the statute's reach and insulated by the First Amendment. *Watts,* 394 U.S. at 707–08, 89 S.Ct. 1399; *United States v. Miller,* 115 F.3d 361, 363 (6th Cir., 1997), *cert. denied,* 522 U.S.

---

4. *See also United States v. Merrill,* 746 F.2d 458 (9th Cir.1984) (mailing letters depicting Ronald Reagan's head impaled on a pike and dripping blood, and containing the words "kill Reagan" was true threat to harm the President); *Roy v. United States,* 416 F.2d 874 (9th Cir.1969)(holding that a Marine assigned to a base the President planned to visit on following day properly convicted for communicating a "true threat" when he told telephone operator, "I hear the President is coming to the base. I am going to get him."); *Pierce v. United States,* 365 F.2d 292 (10th Cir.1966)(ruling that the 17–year–old boy's written statement that he would kill the President of the United States "the first chance I get," given to police officer to be mailed to the White House for him because he was in jail for desertion from the Navy, was held to be "true threat."); *Clark v. United States,* 250 F. 449 (5th Cir.1918) (concluding that statement, "I wish Wilson was in Hell, and if I had the power I would put him there," was threat against the President).

5. In adopting this view, we expressly reject the so-called "reasonable recipient standard" which focuses on the unique sensitivities of the recipient(s) of the threatening statement(s). That standard seeks to determine whether "an ordinary, reasonable recipient who is familiar with the context of the [statement] would interpret it as a threat of injury." *United States v. Maisonet,* 484 F.2d 1356, 1358 (4th Cir.1973). While both tests are objective in nature, we believe the appropriate vantage point for interpreting these statements is what the person making the statement should have reasonably foreseen, rather than what a reasonable person receiving the statement would believe. *See Fulmer,* 108 F.3d at 1490, 1491.

883, 118 S.Ct. 213, 139 L.Ed.2d 147 (1997).[6] In determining whether or not a "true threat" was made, the fact-finder must necessarily consider the context and circumstances in which the statement was made, whether the statement was conditional in nature, who the statement was directed to, the place where it was made, how it was made, and the reaction of those who heard or read it. *See United States v. Carrier*, 672 F.2d 300, 306 (2d Cir.1982); *Watts*, 394 U.S. at 708, 89 S.Ct. 1399.

■ The appellant's reliance on *United States v. Frederickson*, 601 F.2d 1358 (8th Cir.1979), as a basis for asserting that his threat did not violate 18 U.S.C. § 871(a) is misplaced. The facts in *Frederickson* are clearly distinguishable from the appellant's case. In *Frederickson*, the Eighth Circuit reversed the appellant's conviction for threatening the President based upon his statement, made in a fit of anger, that he was going to "eliminate all the pigs from the President on down." *Frederickson*, 601 F.2d at 1361. The court believed three factors were particularly important in their ruling. First, Frederickson contemporaneously made several other remarks at the time he uttered this alleged threat, many "containing threats of a bizarre nature, and others representing unconventional or rebellious responses to police questioning that could not reasonably be taken seriously [under] the circumstances." *Id.* at 1364. Second, "the sweeping nature of his statement, referring to 'all pigs from the President on down,' undermine[d] any inference that [he] intended his words as a threat against the President *personally*." *Id.* (emphasis added). The court reasoned that Frederickson's statement was "no more than a crude method of expressing antagonism towards the arresting officers and law enforcement officers generally." *Id.*[7] Finally,

the booking officer who heard the threat simply asked Frederickson to "turn around and finish being booked," reflecting his lack of concern over the threat.

The appellant correctly describes himself as a problem confinee who was antagonistic toward the staff and noncompliant with brig rules. Appellant's Brief of 16 June 1999 at 5. He argues that his constant antagonistic behavior was a means of venting his displeasure at being confined, and, therefore, he did not intend to threaten the President.[8] *Id.* The appellant was not, however, in a constant state of belligerent agitation. When confronted by MAC Sulia about threats he had made to one of the Pretrial Confinement Facility staff, the appellant was very conversational and low key with the Chief. Record at 60, 68. At times, appellant was very respectful and followed orders with no problem. Record at 61. Although MAC Sulia noted appellant's "total disregard toward anybody [who was] an authority figure," in his dealings with appellant, most often appellant would "stand up and give me straight 'Yes, sir,' 'No, sir,' 'Yes, Chief,' 'No, Chief' answers." Record at 69. Perhaps most telling was the colloquy between trial defense counsel and OS2 Marnati. When asked, "Would it be fair to say that Seaman Recruit Ogren was always trying to piss people off, especially staff members?" OS2 Marnati replied in the negative. When asked whether the appellant did this on a regular basis, OS2 Marnati responded, "It seemed like whenever he had nothing better to do, if he was bored." Record at 87.

The appellant's attempt to paint himself as the seething equivalent of Frederickson merely displaying his anger to the Pretrial Confinement Facility staff is unpersuasive. Applying the factors used by the Frederickson court, we find that the appellant's lan-

---

6. In *Watts*, an 18–year–old boy's statement within a political discussion group congregated on the Washington mall that, "If they make me carry a rifle, the first man I want to get in my sights is L.B.J.," was held to be mere political hyperbole, and not a "true threat."

7. Frederickson *was* convicted of another count alleging violation of 18 U.S.C. § 871(a) which indicated "more specificity" concerning Frederickson's threats towards the President.

8. The appellant does not explain the leap of logic required to connect obnoxious, belligerent behavior to a lack of intent to threaten the President. Appellant's assertion that "[T]he facts of his case closely parallel those of *Frederickson*" is grasping, and ignores that court's affirmation of one of the counts of threatening the President made while Frederickson was confined in the county jail. *Frederickson*, 601 F.2d at 1362, 1364.

guage was unequivocal and directed specifically at President Clinton, and that the Government produced evidence that he spoke the words seriously, deliberately, and neither in jest nor in response to a particular provocation. Record at 76–77, 84–85. Further, unlike Frederickson, who was in the midst of the booking process, appellant had been in pretrial confinement for nearly one-month when he made the threats against the President. Record at 76, 84; Charge Sheet. The statements made to MM3 Lyell and OS2 Marnati were obviously not spoken in the heat of anger as an expression of animosity towards law enforcement, as they were separated by approximately three hours. *Id.* Appellant did not make any contemporaneous bizarre remarks. Record at 76–77, 84–85. Again, the actions taken by MM3 Lyell and OS2 Marnati in logging and reporting appellant's remarks and the summoning of the Secret Service demonstrate a serious concern over the remarks. Record at 77, 85–86, 93. Moreover, appellant's language singled out the President as the initial object of his violent plan. *Id.* We are satisfied that the appellant should have reasonably forseen that his statements would be taken as threats by those to whom they were made and thus were "true threats" within the meaning of this 18 U.S.C. § 871.

## B. "Knowingly and Willfully" Made.

▇▇▇▇▇ The second element of this offense requires that the appellant's "true threat" be made knowingly and willfully. It is well settled among the vast majority of the federal circuit courts of appeal that this element of 18 U.S.C. § 871 establishes an objective test requiring only a showing of general intent.

9. Only the Fourth Circuit has adopted the subjective standard, which construes the term "willfully" to require proof that an accused made the alleged threat with specific intent to execute it. *United States v. Patillo,* 431 F.2d 293 (4th Cir. 1970)(*en banc*) (requiring a present intention to injure the President, or to incite others to injure him, or to restrict his movements). We specifically reject the subjective standard, and adopt the majority view on this issue, a view we believe to be consistent with the intent of the statute.

[T]he willfulness requirement of [§ 871] ... requires only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion. *The statute does not require that the defendant actually intend to carry out the threat.*

*United States v. Johnson,* 14 F.3d at 768 (*quoting Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir.1969))(emphasis added); *see also United States v. Twine,* 853 F.2d 676, 680 (9th Cir.1988); *United States v. Compton,* 428 F.2d 18 (2d Cir.1970); *United States v. Kosma,* 951 F.2d 549, 557 (3d Cir.1991); *United States v. Manning,* 923 F.2d 83, 85–86 (8th Cir.1991); *United States v. Vincent,* 681 F.2d 462, 464 (6th Cir.1982); *United States v. Hart,* 457 F.2d 1087, 1090–91 (10th Cir.1972).

▇▇▇▇▇ Thus, the only requirement is that the accused intentionally and knowingly communicated his threat. *It makes no difference whether or not he actually intended or was able to carry out his threat.*[9] *United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 n. 3 (9th Cir.1990). If the speaker intended to make the statement, knew what the words meant, and reasonably should have foreseen that the statements he made would be understood as indicating a serious intention to commit the act, then this element is satisfied. *Ragansky v. United States,* 253 F. 643, 645 (7th Cir.1918); *but see Watts,* 394 U.S. at 709, 89 S.Ct. 1399 (Douglas, J. concurring)(expressing "grave doubts" as to the correctness of this approach *vis-à-vis* the potential First Amendment implications).[10]

10. Although the Supreme Court in *Watts* once expressed "grave doubts" about the "apparent-determination" standard, and Justice Marshall urged the adoption of a more exacting standard in *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (Marshall, J. concurring) (interpreting 10 U.S.C. § 871(a) to require a showing that "the speaker intended his statement to be taken as a threat, even if he had no intention of actually carrying it out."), the clear trend towards the majority view has persisted.

In this case, we are convinced beyond a reasonable doubt that the appellant's threat to kill President Clinton was "knowingly and willfully" made. First, he knowingly uttered the statement clearly understanding what his words meant. Certainly, he foresaw that his statement, "I'm going to find the President, and I'm going to shove a gun up his ass, and I'm going to blow his f——ing brains out," would be understood by the brig guards who heard it as indicating a serious intention on his part to commit the act (whether he actually meant it or not). Indeed, the two guards who heard and confirmed the threat believed the appellant was serious. One actually recorded the threat in the brig's log-book to document it, and then reported it to the brig's chief petty officer in charge. The seriousness with which this threat was viewed is perhaps best demonstrated by the fact that the U.S. Secret Service Agency was contacted, and a follow-up investigation by that agency was conducted. The fact that the appellant may not have actually meant what he said, or that he eventually apologized, does not serve as a defense to his communication of the threat.

We are unmoved by the argument that the appellant was in confinement and, therefore, ostensibly incapable of carrying out any such threat. The appellant's "imprisonment does not automatically transmute a ... threatening [statement] into an innocuous prank." *United States v. Miller*, 115 F.3d at 363 (*citing United States v. Glover*, 846 F.2d 339, 344 (6th Cir.1988)). While it is a factor we take into consideration, it is in no way dispositive of the issue.

Manifestly, an incarcerated individual who may be associated with a radical political organization, a lunatic fringe element, or any other criminally inclined gang or other affiliation may pose a significant risk of igniting or inspiring criminal activity outside the institution.

. . . .

A reasonable person would foresee that the [statement] in controversy would be construed, and investigated, by the authorities as a potentially serious threat against the [life of the President].

*Miller*, 115 F.3d at 363–364; *United States v. Glover*, 846 F.2d 339 (6th Cir.1988)(inmate's threats to President made from prison were nevertheless true threats despite inability to carry them out, since reasonable person could objectively perceive them to be true threats); *United States v. Lincoln*, 589 F.2d 379, 381 (8th Cir.1979)(per curiam).

We are similarly unmoved by the fact that the appellant suffered from a diagnosed "Antisocial Personality Disorder" at the time that he uttered his threatening words against the President. Such a diagnosis falls short of establishing a lack of mental capacity, and, as this is a general intent offense, in no way relieves him of culpability. *Johnson*, 14 F.3d at 769 (holding that district court properly excluded evidence of diminished capacity with respect to two counts alleging violations of 18 U.S.C. § 871 because each alleged a general intent offense).

Evaluating the evidence in the light most favorable to the prosecution, the Government proved the appellant's guilt beyond a reasonable doubt. The appellant's comments were not political in nature, nor was there any conversation about politics at the time appellant made them. Record at 76–77, 85. The appellant's threats were not truly conditional. Although his first threat was conditioned on his getting out of the pretrial confinement facility "right now," his later threat referred to his inevitable release from the brig.[11] Record at 77, 85. Finally, the appellant does not allege that he did not understand the

---

See *Manning*, 923 F.2d at 85 (citing *United States v. Neavill*, 868 F.2d 1000, 1005 (8th Cir.1989)).

**11.** Even if the appellant's threats were conditional, they could still be considered "true threats." See *Kosma*, 951 F.2d at 554 (holding that defendant's specification of precise date, time and place for President's "21 gun salute" was a true threat; *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir.1983) (concluding that the hospital patient's statement that he would kill the President if released was a true threat); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir.1983) (ruling that the letter offering to kill the President if Secret Service could make arrangements was a true threat). The language that formed the basis of the charge of threatening the President was taken from his later threat heard by OS2 Marnati, which was not conditional. Record at 84–85; Charge Sheet.

meaning of the words he used or the concept of making a threat, nor is there any evidence in the record to suggest that the appellant's threats were the result of mistake, accident, coercion, duress, or some other innocent reason. Accordingly, we are fully satisfied that the evidence presented in this case was both legally and factually sufficient to sustain the military judge's finding of guilty.

### Sentence Appropriateness

The appellant asserts that a sentence which includes a dishonorable discharge is inappropriately severe in his case for the following reasons: the appellant suffered from a diagnosed "Antisocial Personality Disorder" that resulted in a "pattern of disregard for, and violation of the rights of, others," and because the nature of his offenses do not warrant a dishonorable discharge. Appellant's Brief of 7. Accordingly, the appellant asks this Court for specific relief in regard to the dishonorable discharge awarded by the trial judge, and subsequently approved by the convening authority. *Id.* We disagree.

█ A general court-martial is free to impose any legal sentence that it determines is appropriate. *United States v. Turner,* 14 C.M.A. 435, 437, 34 C.M.R. 215, 217, 1964 WL 4998 (1964); RULE FOR COURTS-MARTIAL 1002, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). Notwithstanding this fact, we "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and [determine], on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Generally, sentence appropriateness should be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982)(quoting *United States v. Mamaluy,* 10 C.M.A. 102, 106–07, 27 C.M.R. 176, 180–81, 1959 WL 3587 (1959))(internal quotes omitted).

While we sympathize with the appellant's psychological condition, we do not believe that it in any way excuses or condones his behavior. Also, his diagnosed condition did not prevent him from fully appreciating the nature, quality, and wrongfulness of his misconduct. *See* Defense Exhibit G at 2 ¶ 5(c). The appellant's complete and utter contempt for, and disrespect towards, virtually every authority figure he encountered was seriously disruptive of good order, mission accomplishment, and effective discipline at both his command and within the Pretrial Confinement Facility where his behavior ultimately brought him. His actions were violent and threatening, and clearly calculated to generate anger and fear in his many victims. He also committed a violent battery upon a fellow Sailor, threatened serious bodily harm to a petty officer and her minor children, and willfully and violently damaged military property. Finally, he brought significant disruption to multiple Government organizations when he articulated a disturbing and credible verbal threat against the President of the United States, his Commander–in–Chief. We believe these offenses are extremely serious and more than warrant the sentence the appellant was ultimately awarded, including the significant disapprobation associated with a dishonorable discharge.[12]

█ The appellant's argument appears to be more appropriately styled as a plea for clemency, which involves the act of bestowing mercy. Clemency is the sole prerogative of the convening authority. *United States v. Healy,* 26 M.J. 394, 395–96 (C.M.A.1988); R.C.M. 1107(b). Nothing presented to us in this appeal suggests that the appellant's sentence is inappropriate. He was clearly afforded the individualized consideration contemplated in military law, and we find this assignment of error to be without merit.

### Incorrect Advisement of Maximum Punishment

The appellant next asserts that the military judge erred in explaining during the

---

12. The appellant's service record also reflected that, prior to trial, he had received nonjudicial punishment on two prior occasions, and had a civilian conviction for battery. Prosecution Exhibits 4, 5, 6, and 7. *See also* Defense Exhibits C and D.

providence inquiry what the maximum punishment was that the appellant could be subjected to as a result of his pleas of guilty to a variety of the offenses charged. In particular, the appellant complains that his pleas were not provident because he was not properly advised that a dishonorable discharge could be awarded. Appellant's Brief of 10; *See* R.C.M. 910(c)(1).

This argument is simply erroneous. Though there was initially some confusion over what the maximum punishment was, Record at 14–15, the appellant was ultimately correctly and properly advised that, *based upon his pleas of guilty*, he could be awarded a bad-conduct discharge, confinement for 42 months, total forfeitures, and reduction to E–1. Record at 48. The appellant indicated his complete understanding of this maximum possible punishment, acknowledged having discussed it with his counsel, and stated that he still desired to plead guilty as he had. *Id.* Nothing more was required. The appellant's exposure to a dishonorable discharge (and additional confinement time) came strictly as a result of his *subsequent* conviction on three separate offenses to which he had pled "not guilty."[13]

 In a mixed plea case such as this, we are aware of no requirement that a military judge must also explain the maximum possible punishment an accused *might* be subjected to if he is convicted *additionally* of any or all offenses to which he pled "not guilty." We see no sound rationale for establishing such a requirement, and refuse to do so in this case. This assignment of error is without merit.

### Failing to Establish Counsel Qualifications

In his final, summary assignment of error, the appellant contends that the military judge erred by "not inquiring of the defense counsel's legal qualifications and status as to oath." Appellant's Brief of 12. This claim of error apparently arises as a result of the military judge and the detailed defense counsel failing to pay close attention as they waded through the prefatory portions of the standard trial script for a general court-martial. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), app. 8, at A8–2. Their colloquy on this issue proceeded as follows:

> MJ: Lieutenant Casamento, please state for the record by whom you have been detailed, *your legal qualifications and status as to oath*, and whether you have acted in any disqualifying manner.
>
> DC: Yes, sir. I have been detailed to this court-martial by the Officer–in–Charge, Naval Legal Service Office, North Central Detachment, pursuant to the authority granted to him by Commanding Officer, Nation's Capitol. I have not acted in any manner which might tend to disqualify me in this court-martial....
>
> MJ: Thank—thank you, Lieutenant.

Record at 3 (emphasis added).

 While the military judge erred in failing to properly ascertain on the record the detailed defense counsel's legal qualifications and status as to oath, the facts of this case demonstrate that the error was harmless beyond a reasonable doubt. First, appellant's trial defense counsel, Lieutenant Casamento, was, in fact, properly qualified and sworn in accordance with Articles 27(b) and 42(a), UCMJ, at the time of the appellant's trial. *See* Government's Motion to Attach of 9 Aug. 1999, Enclosures 1 and 2. Additionally, the appellant has neither alleged nor demonstrated any prejudice whatsoever resulting from this obvious oversight. Although there was error, it was harmless and no relief is warranted.

### Conclusion

Accordingly, we affirm the findings and sentence, as approved on review below.

Senior Judge DORMAN and Senior Judge TROIDL concur.

---

**13.** Specifically, appellant's subsequent conviction for communicating a threat in violation of Article 134, UCMJ—which he pled "not guilty" to— authorized the award of a dishonorable discharge.