UNITED STATES, Appellee

V.

Robert B. OGREN, Seaman Recruit
U.S. Navy, Appellant

No. 00-0169

Crim. App. No. 99-0041

United States Court of Appeals for the Armed Forces

Argued October 11, 2000

Decided May 2, 2001

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and SULLIVAN, GIERKE, and EFFRON, JJ.,
joined.

Counsel

For Appellant:  Major Charles C. Hale, USMC (argued);
    Lieutenant Commander L. J. Lofton, JAGC, USN (on brief).

For Appellee:  Lieutenant Deborah Sue Mayer, JAGC, USNR
    (argued); Colonel Kevin M. Sandkuhler, USMC, Commander
    Eugene E. Irvin, JAGC, USN, and Lieutenant Kevin S.
    Rosenberg, JAGC, USNR (on brief).


Military Judge:  Peter. J. Straub


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION.

Judge BAKER delivered the opinion of the Court.

A general court-martial composed of a military judge sitting alone convicted appellant, pursuant to mixed pleas, of disrespectful language (3 specifications), disobeying a petty officer, damaging military property, assault and battery, and communication of a threat (2 specifications), in violation of Articles 91, 108, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 891, 908, 928, and 934, respectively. One specification of communicating a threat involved a violation of 18 USC § 871, "Threats against President[.]" Appellant was sentenced to a dishonorable discharge, confinement for 12 months, and partial forfeitures. The convening authority approved these results, and the Court of Criminal Appeals affirmed. 52 MJ 528 (1999).

On appellant's petition, we granted review of the following issue:

> WHETHER THE LOWER COURT ERRED IN FINDING APPELLANT'S CONVICTION OF THREATENING THE PRESIDENT OF THE UNITED STATES LEGALLY AND FACTUALLY SUFFICIENT AS THERE WAS NO EVIDENCE OF A "TRUE THREAT."

Although this Court has addressed the question of threats, see, e.g., United States v. Phillips, 42 MJ 127 (1995), this is a case of first impression involving the interpretation of 18 USC § 871. After adopting the so-

2

called objective test in our analysis of the willfulness of the threat and viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have reasonably found beyond a reasonable doubt that appellant knowingly and willfully uttered a true threat in violation of § 871.  We affirm.


I.   Facts

The events at issue occurred on July 21 and 22, 1998, 26 and 27 days after appellant was placed in pretrial confinement awaiting general court-martial on unrelated charges.

On two separate occasions on July 21, appellant made statements involving the President.  Appellant first told Petty Officer Lyell: "**** off.  And **** the rest of the staff.  **** Admiral Green.  Hell, **** the President, too. . . .  [As] a matter of fact, if I could get out of here right now, I would get a gun and kill that bastard."  Petty Officer Lyell understood that this latter reference was to the President of the United States.  Appellant did not indicate that he had a plan or scheme to get a gun and kill

the President.  However, Petty officer Lyell took the statement seriously.[1]

Appellant's second statement was to Operations Specialist Second Class Marnati, recounted by Marnati at trial as follows:

> OSI Marnati:  [I asked appellant] why he was beating on his cell and what's he yelling for. . . . He told me, "I can't wait to get out of here, Man." I said, "Why?"  He said, "Because I'm going to find the President, and I'm going to shove a gun up his ***, and I'm going to blow his ****** brains out.". . .I asked him which President he was talking about. . . . He said, "Clinton, Man.  I'm going to find Clinton and blow his ****** brains out" or similar to that.

Appellant's statements surprised Marnati.[2]  He had never heard anyone threaten the President before.[3]  Lyell and Marnati recorded appellant's statements in the log and telephoned the Secret Service.  There is no indication in the record that either statement was made for political, religious, or moral reasons.

The Secret Service responds whenever it receives a report that someone has threatened the President.  On July 22, Special Agent Cohen interviewed appellant.  Asked to

---

[1] At trial, Lyell stated:  "[T]hat's a little bit more serious of anything else that he had done. . . . I took him serious enough, yes."

[2] Marnati testified he was surprised "[n]ot so much [by] the way he said it; it's just the fact he actually said it and what he was going to do."

[3] The record is ambiguous as to whether appellant told one staff member that he wanted to use a knife to kill the President and another staff member that he wanted to use a gun to kill the President.

4

describe what he had said, appellant repeated his statements with words similar to those described above. Special Agent Cohen testified: "[H]e did admit to making a threat -- but he didn't say again that he would do it, no." Significantly, when appellant was asked whether he owned guns, he responded: "No, but I can get them." Appellant also asked Special Agent Cohen "if his other than honorable discharge would affect his ability to get weapons . . . for hunting." At the same time, appellant told the Secret Service that he was blowing off steam and was expressing displeasure at his incarceration. In response to a query by Special Agent Cohen, appellant drafted a sworn statement of apology to the President.

The record reflects that appellant was a "problem confinee" with a mixed record. At times, he was respectful and followed orders. However, he was always making comments to the staff and other confinees. He would holler at them from his cell. He would constantly indicate he did not want to be in the pretrial confinement facility. There were a couple of times appellant caused problems and was placed in segregation. However, after his Secret Service interview, appellant "pretty much quieted down and started actually becoming a little bit more cooperative and

adherent to rules and regulations." Appellant did not subsequently threaten the President.

## II. Discussion

Section 871(a) of Title 18[4] was enacted in 1917 against a backdrop of three presidential assassinations.[5] The statute is intended to prevent and deter individuals from attacking the President or inciting others to do so.[6] The statute is also intended to prevent disruptions in the ability of the President to undertake his responsibilities caused by confining his activities and movement, including those activities of a public nature. Rogers v. United States, 422 U.S. 35, 47 (1975)(Marshall, J., concurring);

---

[4]Section 871(a) provides:

> Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office of by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of The United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowing and willfully otherwise makes any such threat against the President, President-elect, Vice President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

As originally enacted, the statute applied only to the President of the United States.

[5] President Lincoln (1865), President Garfield (1881), and President McKinley (1901). Those purposes remain as valid and needful today as they were in 1917. Since 1917, there has been one presidential assassination and at least six attempts to kill the President or President-elect.

[6] See 53 Cong. Rec. 9377-9378 (1916).

Roy v. United States, 416 F.2d 874, 877 (9th Cir. 1969);

United States v. Hoffman, 806 F.2d 703, 706 (7th Cir.

1986); see also H.R. Rep. No. 652, 64th Cong., 1st Sess. (May

8, 1916) ("It is the first and highest duty of a Government

to protect its governmental agencies, in the performance of

their public services, from threats of violence which would

tend to coerce them or restrain them in the performance of

their duties.").  Finally, the legislative history

indicates that Congress considered threats against the

President to be of such significance as to warrant a

statutory prohibition different from the statutes

applicable to other officials.[7]

However, Congress was also mindful of the statute's

potential to reach protected First Amendment speech and

intended to establish more than a technical offense.  As

the Floor Manager for the bill stated:

> I think it must be a willful intent to do serious
> injury to the President.  If you make it a mere
> technical offense, you do not give him much of a
> chance when he comes to answer before a court and

---

[7] The statement of Representative Mann illustrates these points:
"Assaulting the President of the United States is quite a different
matter from assaulting some private individual. . . .[I]n this bill you
are differentiating the office of President, and the man who fills the
office, from any other citizen of the United States, as ought to be
done."  Representative Webb went further, suggesting that one purpose
of the bill was to protect the President from the "annoyance" of
threatening mail and not only to protect his life.  53 Cong. Rec. 9377.

7

jury.  I do not think we ought to be too anxious to convict a man who does a thing thoughtlessly.

53 Cong. Rec. 9378.

With this legislative history in mind, courts have required the Government to prove two elements beyond a reasonable doubt to convict pursuant to § 871(a).  First, the threat rendered must be a "true" threat.  Second, the threat must be knowing and willful.

A.  True Threat

Section 871(a) must be read consistent with the dictates of the First Amendment.[8]  Justice Douglas has observed that criticism of the President and Congress is an American birthright: "Suppression of speech as an effective police measure is an old, old device, outlawed by our Constitution."  Watts v. United States, 394 U.S. 705, 712 (1969) (concurring).  Therefore, only "true" threats have been found to satisfy the statute's threshold of criminal conduct; a true threat is not protected First Amendment

---

[8] The First Amendment provides that "Congress shall make no law... abridging the freedom of speech[.]"

8

speech.[9]  United States v. Howell, 719 F.2d 1258, 1260 (5th
Cir. 1984); United States v. Carrier, 672 F.2d 300, 303,
306 (2d Cir. 1982).  In addition to political hyperbole,
"true" threats also may not include jests or innocuous
remarks.  Watts, 394 U.S. at 707-08.

In Watts, the Supreme Court found § 871(a)
constitutional on its face, but reversed Watts's conviction
because: (1) the "context"; (2) "the expressly conditional
nature of the statement"; and (3) "the reaction of the
listeners" indicated Watts's words did not amount to a true
threat but, rather, a "kind of very crude offensive method
of stating a political opposition to the President."  Id.
Applying this three-part language, courts have struggled
with the concept of what constitutes a "true threat."

In Howell, a patient in a state hospital made
threatening remarks against the President.  The FBI was
notified by the hospital, and an agent visited Howell.
Howell proceeded to tell the agent "that he had a .357
caliber pistol and that there were two people he wanted to

---

[9]  Justice Holmes's analogy to shouting "Fire!" in a crowded theater is, perhaps, the most famous expression of the limitations of the First Amendment; however, its illustrative instruction only goes so far, as it is an example free of political content.  See generally H. Kalven, A Worthy Tradition (1988), for discussion of the Court's First Amendment jurisprudence and what Kalven describes as "the basic problem of finding an accommodation between speech too close to action and censorship too close to criticism."  Id. at 156.

9

kill—one of them was the President." Howell was advised of his constitutional rights and stated: "If released, I would make my way to Washington and kill him—I will kill the President." The FBI agent asked Howell to write down his statements, and Howell said he wanted a lawyer. The next day, Howell handed a hospital social worker an envelope for the FBI agent containing a letter detailing his threats against the President. 719 F.2d at 1260. The Howell court found Howell's threats to be "true" threats, and that, "[f]ar from attempting to influence others, Howell was merely stating his own unambiguous and apparently quite serious intention to take the life of the President." Id. at 1260-61.

In United States v. Miller, 115 F.3d 361 (6th Cir. 1997), a prisoner claimed that "a rational person" would not believe that a letter he wrote to the President "published a 'true threat' to kill or injure the President or the Vice President because he was incarcerated in a penal institution at the pertinent time and because the letter's content evinced a delusional originator." Id. at 363.

In deciding that the lower court properly submitted the "true threat" issue to the jury, the Miller court found:

> The writing menacingly suggested its author's motives for inflicting injury upon the President and the Vice President, pointedly asserted that his claimed associates outside the prison would carry out the threatened assassinations, and confidently proclaimed his perceived immunity from prosecution by virtue of his incarceration alibi.  The manifest instability and irrationality of the perpetrator of these menaces did not objectively diminish the letter's credibility but instead predictably heightened apprehension by its recipients that the author could be sufficiently imbalanced to seek the realization of his proclamations.

Id. at 364.

In United States v. Frederickson, 601 F.2d 1358 (8th Cir. 1979), the court distinguished between statements that formed the basis of three counts alleging threats against the President.[10]  The Frederickson court found that the statement, "I will have to kill him," referring to the President, was properly submitted to the jury for a determination whether it was a true threat because it was made seriously and without provocation.  On the other hand,

---

[10] Frederickson was arrested for trespass in Iowa.  While in custody, he told the police that he was from California and was on his way to Washington to sue the President.  He then made these three additional statements to the police for which he was prosecuted: "Sue him?  I probably wouldn't get any money anyway.  I will have to kill him." (Count I); "Well, as soon as my toys get here I will eliminate all the pigs from the President on down."  (Count II); "You know, I have an M-79 [grenade launcher].  I am going to blow them all up.  I start with the President and go down."  (Count III).  601 F.2d at 1361-62.  The court reversed on Count II and affirmed Frederickson's convictions on Counts I and III.

statements that he would blow up "pigs" starting with the President and going down, made while upset about his arrest, were distinguished from the same statements made when he was "outwardly calm" and he

> volunteered a scheme of assassination utilizing a specific weapon and commencing with a particular individual, the President, who could be found in the place that was Frederickson's announced destination, Washington, D.C.

Id. at 1364. The former were found not to have been properly submitted to the jury to decide the "true threat" issue. The latter were found to have been properly submitted.

    B.    Willful

The statute also requires that a threat be knowing and willful. A threat is knowingly made if the speaker comprehends the meaning of the words uttered by him. Ragansky v. United States, 253 F. 643, 645 (7th Cir. 1918). However, federal circuits are divided as to whether the test for willful conduct is objective or subjective, that is, whether the statement must reflect an apparent intent to threaten or an actual intent.

        1.   The Objective Test

A majority of circuits apply an objective test: United States v. Fulmer, 108 F.3d 1486 (1st Cir. 1997); United States v. Johnson, 14 F.3d 766 (2d Cir. 1994);

12

Rogers v. United States, 422 U.S. 35; United States v. Miller, 115 F.3d 361; United States v. Hoffman, 806 F.2d 703; Roy v. United States, 416 F.2d 874; Watts v. United States, 394 U.S. 705.  The objective test requires "only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President."[11]  Roy, supra at 877; see also Rogers, supra at 43-44 (Marshall, J., concurring) ("a showing merely that a reasonable man...would have foreseen that the statements he made would be understood as indicating a serious intention to commit the act").  In other words, the willfulness of the statement is measured by the reasonably foreseeable consequences of the words uttered.   Courts have upheld convictions where the declarant pleaded impossibility (United States v. Howell, 719 F.2d 1258) or diminished capacity (United States v. Johnson, supra), or could not have acted upon the threat due to incarceration (Miller).

---

[11] In Roy, the Ninth Circuit appears to have considered both perspectives.  416 F.2d at 877-78.

13

This court has not had occasion to evaluate the application of 18 USC § 871 as assimilated through Article 134. In addressing the application of Article 134, this Court has applied an objective test for willfulness ("The intent which establishes the offense is that expressed in the language of the declaration, not the intent locked in the mind of the declarant." United States v. Greig, 44 MJ 356, 357 (1996) (citing United States v. Humphrys, 7 USCMA 306, 307, 22 CMR 96 (1956)). The offense is complete "when an 'avowed determination to injure another is announced'" (Humphrys, supra, citing United States v. Holiday, 4 USCMA 454, 458, 16 CMR 28 (1954)), provided that the language communicated and all the surrounding circumstances would lead a reasonable person in the recipient's place to perceive a threat. Phillips, 42 MJ at 129.

    2.  The Subjective Test

At least one circuit has adopted a subjective test, holding that a "threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President....There is no danger to the President's safety from one who utters a threat and has no intent to actually do what he

14

threatens."[12]  United States v. Patillo, 431 F.2d 293, 297–98 (4th Cir. 1970).  In Frederickson, the Eighth Circuit applied the subjective test as "the law of this case," without necessarily adopting that standard as the law of the circuit.  601 F.2d at 1363.

3.  The Supreme Court

In Watts, the Supreme Court did not reach this element of the offense and resolve the split between circuits, finding instead that the threat uttered by Watts[13] was not a true threat.  However, the Court expressed "grave doubts about" an objective test of willfulness based on "an apparent determination to carry...[a threat] into execution."  394 U.S. at 707-08.

In Rogers, the Court again declined to resolve the split between circuits as to the proper test for willfulness, ruling on grounds unrelated to the interpretation of the statute.  However, Justice Marshall

---

[12] The court went on to note an exception to its analysis where "inflammatory statements are made in a 'full context' evidencing on the part of the speaker a reckless disregard for the strong likelihood that his listeners would be incited to do harm to the President." 431 F.2d at 298.

[13] During a public rally on the Washington Monument grounds, Watts engaged in a discussion with a number of the participants.  In response to a statement that he get more education before expressing a view on the Vietnam War and the draft, Watts responded:  "They always holler at us to get an education.  And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming.  I am not going.  If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394 U.S. at 706.

15

argued that at a minimum, the willful arm of § 871(a) should require "that the defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one." 422 U.S. at 46 (concurring). Consistent with the Rogers perspective, a majority of courts have concluded that whether measured by subjective or objective intent, the defendant need not have intended to carry out the threat, but only to have made a threat.[14] See, e.g., United States v. Hoffman, 806 F.2d 703.

## III. Conclusion

Like other federal courts, we apply the Watts language for determining a true threat. We also agree with the majority of federal circuits and adopt the objective standard for determining whether the communication was willful. We do so based on the plain language of the statute, its legislative history, and our review of federal case law, which is particularly relevant to this court in interpreting Title 18. The objective test more closely tracks Congress's intent in passing § 871 than the subjective test. Although the protection of the President's life is the paramount concern of the statute,

---

[14] See the comments of Rep. Webb and Volstead. 53 Cong. Rec. 9377-79.

16

the statute is also intended to protect against the harm associated with the threat itself.  422 U.S. at 47.  This harm may occur at the moment a threat issues, e.g., with a change in schedule or the dispatch of investigators.  Thus, even if the recipient's response to a threat is subsequently found to be unreasonable, one of the harms Congress sought to avoid will have already occurred.[15]

In contrast, the subjective test, which seeks to find the declarant's actual intent, imposes too high a threshold to accomplish the purposes for which § 871 was enacted. While application of a subjective test might deter actual assaults on the President, it might not deter a subjectively neutral declarant from inciting others to action, or from disrupting the President's activities where the Secret Service does not have the luxury of knowing actual intent.  For these reasons, § 871(a) does not require that the trier of fact, or the Secret Service, look into the mind of the declarant to determine actual intent.

---

[15] Because 18 USC § 871 can be violated by persons not subject to the UCMJ, our ultimate conclusion as to the sufficiency of the evidence in this case is not based on the President's special status as Commander in Chief or appellant's status as a member of the armed forces. Our decision to adopt an objective standard for willfulness, however, is consistent with the maintenance of good order and discipline in the armed forces and serves to promote the proper relationship between the military force and its Commander in Chief. Nor do we rely on United States v. Stickrath, 242 F. 151 (S.D. Ohio 1917), cited by the lower court, which offers the Government too pliant a description of the objective test.

In adopting the objective standard, we are cognizant of the Supreme Court's "grave concern" with an "apparent" rather than actual intent test, as well as the Court's corresponding admonition that "we must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open[.]" 394 U.S. at 708. Congress did not intend to create a technical offense. For these reasons, application of 18 USC § 871(a) necessarily encompasses a careful application of law to facts. This is particularly so given the importance of distinguishing between a true threat and protected speech. There is little margin for legal error where the First Amendment and the safety of the President are at stake; what comes out of mouths may have grave consequences for both.

In the case at bar, our duty is to determine whether "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Applying that standard to this case, we conclude that a rational trier of fact could have found that appellant

18

threatened the life of the President, in violation of 18 USC § 871(a).

First, appellant's threats were "true" threats. They were not conditional on the occurrence of an event, such as induction in the armed forces.[16] Moreover, the specific context and the reaction of the listeners in that context set these words apart. This is evidenced by the testimony of Petty Officers Lyell and Marnati. In a context where appellant frequently hollered from his cell, they took these threats seriously. They distinguished these words from appellant's other words. They logged them in and then they called the Secret Service.

This specific context and the reaction of the listeners are also directly relevant to the second necessary conclusion -- appellant's threats were knowing and willful. Appellant should have reasonably foreseen that his threats would be understood to be more than a crude method of responding to confinement. Pivotal here

---

[16] In Watts, the Court found that Watts's threat was conditioned on his induction into the armed forces: "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394 U.S. at 706. As discussed above, courts have not found release from incarceration or a mental health facility to be conditional from the perspective of Watts. See, e.g., United States v. Howell, 719 F.2d 1258 (defendant in state hospital at time of threat); United States v. Miller, 115 F.3d 361 (defendant in state penitentiary). Similarly, appellant's limited period of confinement did not make his threat conditional under Watts.

19

are appellant's responses to Special Agent Cohen.  If we accept arguendo that there is doubt whether appellant should have reasonably foreseen that his statements to Petty Officers Lyell and Marnati were threats on July 21 (given his track record of verbal insult), this doubt does not carry over to July 22.  On July 22, with the benefit of a night to reflect and aware that his words had resulted in a Secret Service interview, appellant did not disavow his threat made the previous day.  When asked, he repeated what he had told Petty Officers Lyell and Marnati.  But appellant went further.  Critically, he told Special Agent Cohen that he could get weapons if he wanted, and he asked whether his other than honorable discharge would preclude him from getting weapons.  In this sense, the case parallels Howell, where the defendant was given a night to reflect and still provided his threatening remarks in writing the next morning.

The law makes clear that neither Petty Officers Lyell and Marnati, nor Special Agent Cohen, were required, nor could they be expected, to divine appellant's actual and subjective interest in procuring weapons when released from confinement.  Appellant had said enough to trigger the policy interests and prohibitions of § 871(a).

Appellant's threats <u>may</u> have been made in anger and frustration at being incarcerated, but that does not excuse their threatening content.  In some cases, it may make the threat more credible, as noted by the <u>Miller</u> court.  Nor were appellant's words uttered in a political context, intertwined with the substance of political protest or criticism, or an effort at sharing ideas.[17]

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

---

[17]To paraphrase Judge Learned Hand in <u>United States v. Dennis</u>, 183 F.2d 201 (2d Cir. 1950), having not brought himself within the zone of protected speech, we need not decide how far outside that zone appellant has landed.