**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**LOUIE GIM HALL and Wong Suey Loon,**
**Defendants-Appellants.**

**No. 138, Docket 24195.**

United States Court of Appeals
Second Circuit.

Argued April 9 and 10, 1957.

Decided May 27, 1957.

See also 18 F.R.D. 384.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City (Jerome J. Londin and Maurice N. Nessen, Asst. U. S. Attys., New York City, of counsel), for plaintiff-appellee.

Steinberg, Friedman & Blau, New York City (Louis Steinberg, New York City, of counsel), for defendants-appellants.

Before HAND, MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

Defendants Louie and Wong, the two appellants, were charged with wilfully giving $150 to Dorris E. Yarbrough, an investigator of the Immigration and Naturalization Service of the United States Department of Justice, "with the intent to influence his decision and action on a matter at that time pending before him in his official capacity," and the jury found them guilty as charged, but with a recommendation for leniency. Each defendant was given a suspended sentence of two years imprisonment and they were placed on probation on condition that they cooperate with all agencies of the federal government.

It is claimed: (1) that no crime was proved and that the indictment should have been dismissed; (2) that entrapment was established as a matter of law; (3) that the jury was improperly induced to find appellants guilty; and (4) that it was prejudicial error to deny a pre-trial motion to compel the disclosure of a so-called "confession" signed by Wong and a transcript of questions put to him by an

Assistant United States Attorney and his answers thereto.

■ We need not tarry long over the first point. Application had been made in San Francisco for the admission of two young Chinese as the sons of Louie. It developed at the trial that they were not his sons. On January 9, 1952, Louie, Wong and a third person appeared at the Immigration and Naturalization Service in New York City and their testimony, given through an interpreter, was taken by Yarbrough, a specialist in Chinese affairs, in the course of his duties as investigator; and the transcribed testimony was forwarded by Yarbrough to San Francisco for use by the immigration authorities there.

Later a letter was forwarded from San Francisco which led Yarbrough's superiors to assign to him the task of making a further investigation to determine whether a fraud was being perpetrated against the Government. In the course of this investigation Yarbrough called upon Louie and asked him whether his sons had been admitted. Louie replied that they had not. The substance of the ensuing conversation was that Yarbrough first raised the question of money by asking whether Louie had taken care of the interpreter. Louie said he had, but agreed to "cut him out" and give the money to Yarbrough. Wong, who spoke better English, was to follow this up, which he did by telephone, finally fixing the amount as $250, half of which was to be paid at once and the balance after the boys were admitted. What Yarbrough was to do was to "take more testimony and then write a letter to Washington." On May 1, 1952, Yarbrough, Louie and Wong met at a restaurant, and, in the view of several FBI men, Wong placed $150 in currency, covered by a napkin, in Yarbrough's hand, and appellants were arrested.

It is beyond dispute that Yarbrough was engaged on official government business [1] and that the payment was made to induce him to take some action which would, as appellants hoped, result in the admission of the two boys. There was ample basis for a finding of corrupt intent. It was of no moment that Yarbrough had no authority to grant or deny the application of the alleged sons for admission to the United States. Nor need we inquire into the question of how far he was subject to the orders of his superiors or what he could or could not have done to further the scheme of appellants to get the so-called sons of Louie past the immigration authorities in San Francisco. Yarbrough was an official investigator and appellants endeavored to influence him to neglect his duties by means of a bribe. There was plainly enough evidence to justify the submission of the case to the jury. United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930; United States v. Troop, 7 Cir., 235 F.2d 123; Wilson v. United States, 4 Cir., 230 F.2d 521; Krogmann v. United States, 6 Cir., 225 F.2d 220; Hurley v. United States, 4 Cir., 192 F.2d 297; Kemler v. United States, 1 Cir., 133 F.2d 235; United States v. Levine, 2 Cir., 129 F.2d 745; Whitney v. United States, 10 Cir., 99 F.2d 327; Cohen v. United States, 6 Cir., 294 F. 488, certiorari denied 264 U.S. 584, 44 S.Ct. 333, 68 L.Ed. 861.

■ While it is true that Yarbrough first brought up the subject of money, the very recital he gave of his conversations with Louie and Wong was enough to support a finding that there was no entrapment. The instructions to the jury on this issue were unexceptionable and clear. The predisposition to the commission of the crime charged is further to be inferred from what was said by appellants on the subject of "taking care

---

1. 8 C.F.R. § 60.25(a) (1949 ed.) provides: Whenever a district director has reason to believe that there has been a violation punishable under any criminal provision of the immigration, nationality, or related laws administered or enforced by the Service, he shall cause an immediate investigation to be made of all the pertinent facts and circumstances. After the investigation is completed, the district director shall take or cause to be taken whatever action is required by the rest of this section.

of" the interpreter, and Wong's statement, "If this works, I have several more. There is one at Ellis Island now." And the suggestion that the money was paid as a mere "gratuity" has little to support it, as neither Louie nor Wong testified in his own defense.

But the jury were troubled over the case. On the first trial, in May, 1953, the jury became hopelessly deadlocked and they were discharged. We do not know what caused the long delay before the second trial in February, 1956. Despite the statements made by appellants which the prosecution calls "confessions," and which make it clear beyond cavil that the money was paid and that appellants hoped for some sort of assistance or at least lack of opposition on the part of Yarbrough, there were elements in the case including the testimony of the character witnesses, which undoubtedly caused some and perhaps many of the jurors to hesitate to vote for the verdict which was ultimately recorded in the trial now under review.

After receiving the instructions of the trial judge, the jury commenced its deliberations at 3:50 p. m. At 6:00 o'clock the jury returned to the box and submitted three questions which were pertinent to the issues and which the trial judge answered well enough. He then asked the jury whether they thought they could dispose of the case before 6:30 or wanted to go to dinner. He added, "I don't want to rush anybody; I want to give both sides a fair trial." The foreman replied, "We will try"; and the jury retired for further deliberations.

At 7:35 p. m., still without any recess for dinner, the jury returned and inquired,

"If we bring in a guilty verdict, can we find one defendant guilty in a lesser degree than the other?"

The trial judge said, "No," and further deliberations continued without pause until 9:20 p. m., when the jury submitted two further questions:

"Can we recommend leniency for one or both defendants? If not, can we bring in a verdict for one and not the other?"

In answering the first of these two questions, the trial judge made a fine start. He said in substance that the jury must first pass upon the question of the guilt or innocence of each defendant, that then they could make a recommendation of leniency if they chose to do so, but that the question of punishment rested entirely with the court and "is of no concern to the jury." There had been no comment by anyone on the subject of the lateness of the hour and the fact that the jury had been deliberating steadily for almost six hours without their dinner. Had the trial judge stopped at this point and addressed himself to the second question, there would have been no substantial basis for a claim of error. But he went on, and said:

"If you find the defendants guilty, or either one of them, you may make a recommendation of leniency, and I can say for myself that I would accept such recommendation in the spirit in which it is made and as a fellow human being."

This was going pretty far, but still probably left the jury with the impression that the punishment to be meted out in the event of a verdict of guilty would not be controlled by any recommendation they might make. In other words, up to this point the reluctant jurors could not be assured that the court might or might not give favorable consideration to a recommendation of leniency; they could not accede to the wishes of the other jurors with any assurance that the defendants would not be punished severely, at least with some sort of jail sentence. We cannot tell how many jurors were holding out for acquittal; nor have we any basis for speculation on the subject of how these jurors were being gradually induced to accede to the wishes of the others by arguments or by weariness and a desire to get home to their dinners.

In any event, the trial judge answered the second question in words quite apt for the occasion. But, he came back to

the subject of a recommendation of leniency, and added:

"I repeat again that if you see it in your hearts, if you find either one or both of the defendants guilty, to recommend leniency, I will be glad to have that recommendation and you may be sure that it will be acted upon accordingly."

This did the business; and fifteen minutes later, at 9:45 p. m., the jury found both defendants guilty "with a recommendation for leniency."

 We cannot say that, under these circumstances, no juror holding out for acquittal was led to abandon his position by the judge's assurance that a recommendation for leniency would be acted upon. More than likely, one or more jurors entertaining doubts as to appellants' guilt agreed to vote for conviction because they had it in their power to soothe their consciences by causing little or no punishment to be imposed. The courts have repeatedly held that where such a compromise has been encouraged by remarks by the trial judge indicating the probability of light punishment, a verdict of guilty cannot stand. E.g., Demetree v. United States, 5 Cir., 207 F.2d 892; Lovely v. United States, 4 Cir., 169 F.2d 386; Miller v. United States, 37 App.D.C. 138; Bethel v. State, 162 Ark. 76, 257 S.W. 740, 31 A.L.R. 402; Bryant v. State, 205 Ind. 372, 186 N.E. 322; State v. Kernan, 154 Iowa 672, 135 N.W. 362, 40 L.R.A.,N.S., 239; People v. Warner, 289 Mich. 516, 286 N.W. 811; Territory v. Griego, 8 N.M. 133, 42 P. 81; People v. Sherwood, 271 N.Y. 427, 3 N.E. 2d 581; State v. Rowell, 224 N.C. 768, 32 S.E.2d 356; State v. Shea, 226 S.C. 501, 85 S.E.2d 858; State v. Kiefer, 16 S.D. 180, 91 N.W. 1117; McBean v. State, 83 Wis. 206, 53 N.W. 497.

There remains only appellants' contention that it was reversible error to deny their pre-trial motion to inspect the statements made by Wong following his arrest. Since we have decided that the judgment of conviction must be set aside, and the statements have now been disclosed by the prosecution, we need not decide whether the District Court has the power to order such a disclosure, a question of no little difficulty. See, e.g., Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879; Shores v. United States, 8 Cir., 174 F.2d 838, 11 A.L.R.2d 635; State v. Tune, 13 N.J. 203, 98 A.2d 881; compare United States v. Peltz, D.C., 18 F.R.D. 394, with United States v. Peace, D.C., 16 F.R.D. 423. We deem it not improper to add, however, that, if such power does exist, Judge Kaufman properly exercised his discretion in denying the motion for the reasons stated by him in his opinion reported at D.C., 18 F.R.D. 384.

Reversed and remanded.