FIRST DIVISION
March 27, 2006

No. 1-03-3127

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 01 CR 30742 |
| | ) | |
| BYRON JONES, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAHILL delivered the opinion of the court:

Defendant Byron Jones was convicted by a jury of first degree murder and sentenced to 23 years in prison. He appeals his conviction on the grounds: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it told the jury it could recommend leniency in sentencing if it found defendant guilty; and (3) the State improperly alluded to gang motive during its opening and closing arguments. We affirm.

The events leading to defendant's conviction occurred on November 18, 2001. Nikita Stoud was shot and killed that day outside a liquor store near the corner of Kedzie and Maypole Avenues, in Chicago. Defendant was charged with first degree murder. Peter Lawrence, also known as PJ, and Jermaine Jackson, also known as Little Hawk, were also charged with murder in separate criminal proceedings not at issue here. The following evidence was presented at defendant's jury trial.

Tracy Redmond testified that, on the night in question, he drove the victim to a liquor

store on Kedzie Avenue. Redmond parked his car on Kedzie and stayed in it while the victim went into the store. While waiting for the victim to return, Redmond heard gunshots and saw a group of men running. Redmond looked toward Maypole Avenue and realized the gunfire was coming from a gray Pontiac. The Pontiac was heading east on Maypole past Kedzie and out of Redmond's sight. The Pontiac reemerged moments later, heading south on Kedzie. The Pontiac drove to Maypole and stopped. Redmond said he could see four people in the car at that point but he could not make out their faces. Redmond said all four occupants were firing guns out the windows toward a group of men standing outside the liquor store. Redmond testified he saw the driver firing a gun with his left hand while steering the car with his right hand. Redmond admitted he could not identify the driver but said the driver had light-colored skin. When asked if the driver's skin was lighter than that of defendant, Redmond said it was. Once the shooting stopped and the Pontiac drove away, Redmond saw the victim lying on the ground outside the liquor store. The police arrived at the scene and the victim was taken by ambulance to the hospital, where she was later pronounced dead.

Lieutenant Mark Hawkins testified that, on November 23, five days after the shooting, defendant voluntarily turned himself in to the police station. Hawkins, who was already investigating defendant for the victim's murder, placed defendant in an interview room and read him his Miranda rights. Hawkins asked defendant if he understood why he was being investigated and defendant responded "yes, I was driving the car when the lady was shot."

Hawkins testified defendant made the following admissions during the interview. Defendant said that, on the day in question, he was driving when he saw two people he knew as PJ and Little Hawk. Defendant said PJ and Little Hawk were members of the Black Souls street

2

gang and, although defendant was not also a gang member, he knew PJ and Little Hawk from the neighborhood. PJ and Little Hawk asked defendant to give them a ride to the store and defendant agreed. Once inside the car, PJ told defendant to drive to a house on West Lexington Street, in Chicago, to pick up a third person. Defendant said he drove to the house and stayed in his car while PJ and Little Hawk went inside. Defendant said he waited about 15 minutes until PJ, Little Hawk and a man named Derrick came outside and returned to the car. Defendant said he was told to drive eastbound on Maypole. While driving, PJ saw a man on the street and said "there goes one of those [expletive deleted] now" and began firing a gun. Defendant said Little Hawk and Derrick also began firing guns out of the car. Defendant said he did not know the men were armed until this time. Defendant drove around the block and returned to the area where the shooting took place. Defendant said PJ, Little Hawk and Derrick began shooting again at a group of men standing outside the liquor store on Kedzie. After the shooting stopped, defendant drove to Little Hawk's house. Defendant said PJ, Little Hawk and Derrick put their guns, three in total, on a table in Little Hawk's house. Defendant and the others then turned on the news and learned someone had been shot. Defendant said he left his car at Little Hawk's house and got a ride home from Derrick's brother. Two days later, a girl named Rabbit drove defendant to Little Hawk's house to retrieve his car. Defendant said he learned the police were looking for a gray Pontiac involved in the shooting and so he had his car painted white.

Assistant State's Attorney Dan Groth testified he interviewed defendant on November 24, 2001. After speaking with Groth, defendant volunteered to give a videotaped statement about his involvement in the shooting. Defendant said in his videotaped statement that, on November

3

18, 2001, he was driving home when he was flagged down by PJ and Little Hawk. PJ and Little Hawk asked for a ride to the store. Defendant agreed and they got inside the car. Defendant said that, once inside, Little Hawk pulled a gun from his waist and placed it on his lap. The group then proceeded to Derrick's house. Defendant said he went with PJ and Little Hawk into Derrick's house. While inside, Little Hawk was flashing and kissing his gun. Defendant said PJ then pulled out a gun and began doing the same. Derrick also flashed a gun. Defendant said the three with guns stayed and talked while he went to a separate area of the house and watched football. A little while later, defendant and the others left Derrick's house and began to drive around again. PJ told defendant to drive down Maypole. While driving, PJ saw a man on the street and said "there go one of them [expletive deleted] right there." Defendant said they were in Gangster Disciple territory at the time. The Black Souls, to which defendant said PJ, Little Hawk and Derrick belonged, were at war with the Gangster Disciples. PJ began shooting at the man on the street. Defendant said Little Hawk and Derrick also began shooting. Defendant was then told to "go, go." Defendant said he circled the block and Derrick began shooting again. Defendant slowed the car while Derrick was shooting. Defendant then heard police sirens and "got shook up." Defendant drove away toward Little Hawk's house. Defendant said that, at the house, PJ, Little Hawk and Derrick put their guns on a table and talked about how "pretty" the guns were. They then turned on the television to see if the shooting had made the news. Defendant said the news reported the incident and showed that two women had been shot. Derrick's brother then came to the house and picked up Derrick. A different person not identified by name drove defendant home. Defendant said the next day a girl named Rabbit picked him up and took him to Little Hawk's house. Defendant picked up his car and drove it to

his grandmother's house.  Defendant said he learned the following day that police were looking for a gray Pontiac.  Defendant said he then took his car into a paint shop and had it painted white.

Detective Patrick Deenihan testified he interviewed PJ on November 23, 2001, in connection with the victim's murder.  Based on information obtained during the interview, Deenihan went to Michelle Guider's house and retrieved a .38-caliber revolver.  The gun was taken to the police station and inventoried.

William Moore, a forensic investigator for the Chicago police department, testified he was assigned to investigate the crime scene.  Moore said he recovered several metal fragments and spent bullets from the scene.

Caryn Tucker, a forensic scientist for the Illinois State Police, testified she examined the metal fragments and bullets recovered from the crime scene.  She also examined the .38-caliber revolver obtained from Michelle Guider's house.  Tucker found that, from the items suitable for firearm comparison, the fragments and bullets were fired from two .38-caliber guns and at least one more gun that was either a .38-caliber or 9-millimeter firearm.  Tucker said the evidence showed at least three guns were used in the shooting.  A fourth firearm could have been used, but she could not make a positive identification from the evidence available for comparison.

The State, in its closing argument, argued defendant shared a common gang-related motive with PJ, Little Hawk and Derrick.  The State implied through its argument that defendant cooperated with PJ, Little Hawk and Derrick to gain admittance into the Black Souls street gang.  The inference built on the State's opening argument in which it said:

"This defendant and the *** Black Souls were on a mission.  [Defendant]

5

and a person named [Little Hawk] and a person named [PJ] and a person named

Derrick *** were in his car armed to the teeth, a rolling arsenal, and they decided

that they were going to roll on the Gangster Disciples."

The jury was instructed on first degree murder and on the law of accountability. The jury was told it could find defendant guilty of first degree murder if it found that he, or one for whose conduct he was legally responsible, performed acts that caused the victim's death and either he, or one for whose conduct he was legally responsible, intended to cause great bodily harm, knew his acts would cause death or knew his acts created a strong probability of death. During its deliberations, the jury sent a note to the court that asked, "[i]f we the jury[] find the defendant guilty, would we be able to [recommend] [leniency] [toward] him?" The trial court suggested the jury be told it could recommend leniency but it is the trial court's duty to decide a sentence if a defendant is found guilty. Defendant did not object but requested the court add additional language admonishing the jury that its verdict could not be influenced by whether it could recommend leniency. The court denied the request on the ground it was duplicative of the instructions the jury was already given. The court instructed the jury that it could recommend leniency but that it was the function of the court to decide defendant's punishment if he were found guilty. The jury returned a guilty verdict 15 minutes later. On the verdict form, the jury wrote in addition to guilty: "We the jury[] would like to recommend [leniency] in sentencing."

Defendant's first argument on appeal concerns whether the State presented sufficient evidence to prove guilt beyond a reasonable doubt. The standard of review that applies where a defendant challenges the sufficiency of the evidence requires that we decide, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have

6

found the essential elements of the crime beyond a reasonable doubt. People v. Evans, 209 Ill. 2d 194, 209, 808 N.E.2d 939 (2004). "We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of the defendant's guilt." Evans, 209 Ill. 2d at 209.

The State presented alternative theories of defendant's guilt. First, the State argued defendant had a gun and participated in the shooting. Alternatively, the State argued, even if defendant were not an actual shooter, he is legally accountable for the actions of his passengers. Defendant contends the State failed to prove either theory beyond a reasonable doubt.

We begin by addressing the evidence presented under a direct theory of liability. A person commits first degree murder when he kills a person without legal justification and, while performing the acts that cause the death: (1) he either intends to kill or do great bodily harm to that person or another or knows that such acts will cause death to that person or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that person or another; or (3) he is attempting or committing a forcible felony other than second degree murder. 720 ILCS 5/9-1(a) (West 2000). Defendant argues a reasonable doubt of his guilt exists because the evidence was inconclusive in identifying a fourth gun and, consequently, there was no evidence that he was a shooter. Defendant also argues Tracy Redmond's identification of the driver as a shooter is not credible due to Redmond's testimony that the driver's skin color was lighter than that of defendant. This evidence is not sufficient for reversal under our standard of review. We must view the evidence in the light most favorable to the prosecution, not the defense, and decide whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Evans, 209 Ill. 2d at 209. Redmond

said he saw the driver, admittedly defendant, shooting a gun with his left hand while steering the car with his right hand. The physical evidence did not rule out the possibility that a fourth gun was used in the shooting and corroborated Redmond's testimony. Viewing this evidence in the light most favorable to the prosecution, a rational juror could have concluded defendant was a shooter.

We also find the State proved defendant's guilt under a theory of accountability. "A person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 1998). While mere presence at the scene of an offense is not by itself sufficient to sustain a conviction on an accountability theory, an accused may be held accountable for acts performed by another under a common plan or purpose. People v. Cooper, 194 Ill. 2d 419, 434, 743 N.E.2d 32 (2000). "The 'common design' rule provides that where two or more people engage in a common criminal design or agreement, acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." Cooper, 194 Ill. 2d at 434-35. "Proof of [a] common purpose or design need not be supported by words of agreement, but may be drawn from the circumstances surrounding the commission of the unlawful conduct." Cooper, 194 Ill. 2d at 435. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." Cooper, 194 Ill. 2d at 435. Accountability does not require proof of a

8

preconceived plan if the evidence shows involvement by the accused in the spontaneous acts of the group. Cooper, 194 Ill. 2d at 435.

The most pertinent piece of evidence of defendant's accountability is his admission that he circled the block after the initial shooting and slowed the car during the second round of firing. Whether defendant was armed or knew before the shooting that his passengers were armed are not essential facts because defendant's actions during the attack show he acquiesced in furthering the criminal purpose of his passengers. There is no reasonable doubt of defendant's guilt given the evidence in this case.

Defendant relies on the facts in People v. Taylor, 186 Ill. 2d 439, 712 N.E.2d 326 (1999), to argue his conviction on a theory of accountability cannot stand. The defendant there was driving with a friend who the defendant knew was carrying a gun. Taylor, 186 Ill. 2d at 442. The defendant was involved in a traffic accident with the victim. Taylor, 186 Ill. 2d at 442-43. The victim got out of his car and began verbally assaulting the defendant's friend. Taylor, 186 Ill. 2d at 443. The defendant's friend fired the gun at the victim. Taylor, 186 Ill. 2d at 443. The defendant was convicted of aggravated discharge of a firearm on a theory of accountability. Taylor, 186 Ill. 2d at 444. The supreme court reversed the defendant's conviction because there was no evidence that the defendant knew his friend intended to fire the gun. Taylor, 186 Ill. 2d at 448. "The fact that [the] defendant was involved in an unforeseeable, spontaneous traffic altercation militates heavily against any notion that he somehow had knowledge of [his friend's] intentions once [the] defendant's vehicle came to a halt and [the friend] exited." Taylor, 186 Ill. 2d at 448.

Unlike Taylor, defendant here knew his passengers were armed and had already been

9

firing their guns by the time defendant made a second pass by the liquor store. Even if the evidence showed defendant had no idea his passengers were armed and had criminal intent at the time the first set of gunshots was fired, he certainly had this knowledge when he returned to the scene. There is no evidence negating the implication drawn from the evidence that defendant shared his passengers' criminal intent when he circled the block and a second round of firing occurred.

Defendant next argues he is entitled to a new trial because the trial court instructed the jury it could recommend leniency in sentencing if it found defendant guilty. Defendant maintains the jury's verdict was "improperly induced" by this instruction.

The trial court has a duty to instruct the jury when clarification is requested, the original instructions are insufficient or the jurors are manifestly confused. People v. Reid, 136 Ill. 2d 27, 39, 554 N.E.2d 174 (1990). The court must respond to the jury with specificity and accuracy. People v. Shaw, 186 Ill. 2d 301, 320, 713 N.E.2d 1161 (1998).

The parties appear to agree that the trial court was under an obligation to respond to the jury's request because it raised the issue of punishment. The partes' disagreement concerns the accuracy of the response. Before we address the merits of their arguments, we consider the State's contention that defendant waived the issue for review.

Failure to object or raise an issue at trial or in a posttrial motion waives that issue for review. Reid, 136 Ill. 2d at 38. If a defendant agrees with a trial court's answer to a question from a jury, he cannot later complain that the trial court abused its discretion. Reid, 136 Ill. 2d at 38. These waiver rules serve at least two purposes: (1) timely objections allow the trial court to correct promptly an error; and (2) a party who fails to object cannot obtain the advantage of

receiving a reversal by failing to act. Reid, 136 Ill. 2d at 38.

During the jury instruction conference, the State submitted IPI Criminal 4th No.1.01 (Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000)). That instruction reads:

"[1] Members of the jury, the evidence and arguments in this case have been completed, and I now will instruct you as to the law.

[2] The law that applies to this case is stated in these instructions, and it is your duty to follow all of them. You must not single out certain instructions and disregard others. [When I use the word 'he' in these instructions, I mean a male or a female.]

[3] It is your duty to determine the facts and to

determine them only from the

evidence in this case. You are to

apply the law to the facts and in this

way decide the case.

[4] [You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation. It is the function of the trial judge to determine the sentence should there be a verdict of guilty.]

[5] Neither sympathy nor prejudice should influence you. [You should not be influenced by any person's race, color, religion, or national ancestry.]

[6] From time to time it has been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions [and exhibits] which were

11

withdrawn or to which objections were sustained.

[7] Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

[8] You should disregard testimony [and exhibits] which the court has refused or stricken.

[9] The evidence which you should consider consists only of the testimony of the witnesses [and the exhibits] which the court has received.

[10] You should consider all the evidence in the light of your own observations and experience in life.

[11] Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be.

[12] Faithful performance by you of your duties as jurors is vital to the administration of justice."  Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000).

The committee notes following the instruction explain the bracketed material should be used where applicable and that paragraph 4 should only be used where the issue of punishment is raised during trial.  See Illinois Pattern Jury Instructions, Criminal, No. 1.01, Committee Note (4th ed. 2000).  Defendant argued paragraph 4 should be stricken from the State's tendered IPI Criminal 4th No. 1.01 because punishment was not at issue during trial.  The trial court agreed and submitted the instruction to the jury without paragraph 4.

But the issue of punishment was raised by the jury during its deliberations when it asked

12

the trial court whether it could recommend leniency if it found defendant guilty. The following colloquy occurred between the trial court and the parties in deciding the proper response to the jury's inquiry:

"THE COURT: *** All right. I received a note from the jury. ***

[Defense counsel], do you have any input?

MR. STERNBERG [Defense Counsel]: [The jury should be instructed:] You are not to concern yourself with any possible sentence.

THE COURT: Well, they have a right to know this. Is that what you're saying? That's the thing you objected to on the [IPI Criminal 4th No.1.01].

MR. STERNBERG: Now that the question is coming up, I would reconsider. Would you accept a recommendation from them?

THE COURT: Are you asking me questions?

MR. STERNBERG: They're only allowed to sign the jury verdict.

* * *

THE COURT: Who said that? Give me one case that ever said they can't send an additional note saying they want this or they want that.

MR. STERNBERG: I'm asking.

THE COURT: All right.

Now, I'm asking you for input[,] State, while Mr. Sternberg's thinking [about] his answer.

MR. BROGAN [Assistant State's Attorney]: Judge, we would ask that they be told basically that paragraph of the I.P.I. that is not placed in 1[.]01[:]

13

You are not to concern yourself with possible punishment. It would be up to the trial judge to issue a sentence.

THE COURT: Yeah, but here is the thing. They are concerned with it, all right?

Do you both want that part of the I.P.I. instruction put in then?

MR. BROGAN: Yes.

MR. STERNBERG: No.

THE COURT: Well, about four seconds ago[] you said yes.

MR. STERNBERG: I changed my mind.

THE COURT: Because the State now recommends it, you say no?

MR. STERNBERG: I think the answer should be yes.

***

THE COURT: All right.

Here is what my proposed answer is. Dear jury: Yes, you can recommend leniency, but it is for the trial court to determine the sentence if there is a finding of guilty. Please continue to deliberate.

MR. STERNBERG: Judge, I have one more concern.

THE COURT: Sure. Go on.

MR. STERNBERG: ***

If you answer[] yes, you may recommend *** leniency, I would ask that you add to your answer language to the effect that your verdict, however, should not be based upon this answer. Because the answer that you are giving them may

influence their verdict one way or the other and it shouldn't.

THE COURT: Okay.

Well, I have *** to be honest with the jury and not deceptive, and it's a straightforward question. Can they recommend leniency [toward] [defendant]. And the answer is yes.

* * *

MR. STERNBERG: I'm not objecting to that. What I'm concerned about is the additional language admonishing them that their verdict should not be affected by that *** answer. ***

THE COURT: Well, have you looked at the other instructions we've given them?

MR. STERNBERG: I know about them. Yes, I have.

* * *

THE COURT: It says that their verdict must be based on the facts and *** the law that applies to this case.

MR. STERNBERG: All right. Then perhaps language reminding them of that fact should be added to your answer so that their verdict –

THE COURT: Okay. *** I understand your point, but I mean, I can't consider this jury [any more] intelligent, less intelligent that anybody else. They have all of the instructions. They have an instruction to follow all of the instructions. So, I'm not going to assume that they didn't follow these instructions.

15

MR. STERNBERG: Certainly cautionary language isn't going to cause any harm.

THE COURT: God love you, Mr. Sternberg, but here's the thing. It's a very simple question, and I'm going to give them a very straightforward answer. I'm not going to be deceitful. I'm not going to be misleading. All right. So, you're going to object to this?

MR. STERNBERG: Well, I don't object to the answer. I object to the fact that it doesn't contain my requested admonition that their verdict *** should be based upon the law.

THE COURT: That is in the instructions already."

The record does not support the State's position that defendant waived his right to argue the trial court's response to the jury was improper. Defendant's argument to the trial court was that the jury would use its ability to recommend leniency to reach a compromise verdict. Defendant requested an additional admonishment on this ground. Defendant argues on appeal the trial court's refusal to give the additional admonishment rendered its response to the jury incomplete and serves as evidence of an improperly reached verdict.

We now address the merits of the argument. Defendant maintains the jury's verdict was "improperly induced" by the court's response to the jury's question. The jury's only function is to decide guilt or innocence. People v. Masini, 78 Ill. 2d 17, 22-23, 397 N.E.2d 1368 (1979). If the jury recommends punishment or leniency without statutory authority, the recommendation will be disregarded and will not affect the verdict. See Masini, 78 Ill. 2d at 22-23. But if the circumstances strongly suggest there would have been no agreement as to the verdict unless the

recommendation of leniency was also accepted, the effect of the recommendation would render the verdict void.  See Cook v. United States, 379 F.2d 966, 970 (5th Cir. 1967).

Defendant suggests the "exceptional circumstances" of this case "strongly [suggest] that the jury's verdict was induced by the court's affirmative answer to the jury's question." Defendant explains the jury had not yet decided guilt or innocence when it submitted its question to the trial court.  Defendant maintains if the jury had already reached a verdict, it would not have asked the trial court: "*[i]f* we the jury[] find the defendant guilty, would we be able to [recommend] [leniency] [toward] him?"  (Emphasis added.)  Defendant also maintains the jury's verdict, given 15 minutes after it received the court's response that it may recommend leniency, shows the jury relied on the court's answer in reaching its verdict.  Defendant sets forth only one possible explanation for the jury's actions.  But, it is plausible that the jury reached a verdict and signed the verdict form before it asked the court whether it could recommend leniency.  On receiving the court's answer, the jury could have simply written on the jury form the additional recommendation and informed the bailiff it was ready to render its verdict to the court.  In other words, the record does not contain a set of circumstances that would "strongly suggest" the jury relied on the trial court's instruction that it could recommend leniency in reaching its verdict.

We can find no Illinois case that stands for the proposition that a jury's recommendation of leniency automatically renders a verdict void.  In fact, leniency recommendations have been acknowledged and, as a general rule, will not invalidate a jury verdict.  See Masini, 78 Ill. 2d at 23; Rogers v. United States, 422 U.S. 35, 38, 45 L. Ed. 2d 1, 5, 95 S. Ct. 2091, 2094 (1975). Although we are unable to locate an Illinois case directly on point, we have found cases from the federal courts instructive on this issue.

In <u>United States v. Hall</u>, 245 F.2d 338 (2d Cir. 1957), a jury in a bribery action asked the trial judge during its deliberations whether it could recommend leniency for the defendants. The trial judge responded that, if the jury reached a guilty verdict, it could then recommend leniency but admonished the jury that it was the court's function to decide an appropriate punishment. <u>Hall</u>, 245 F.2d at 340. The court went on to say, " 'If you find the defendants guilty, or either one of them, you may make a recommendation of leniency, and I can say for myself that I would accept such recommendation in the spirit in which it is made and as a fellow human being.' " <u>Hall</u>, 245 F.2d at 340. The trial court continued, " 'I repeat again that if you see it in your hearts, if you find either one or both of the defendants guilty, to recommend leniency, I will be glad to have that recommendation and you may be sure that it will be acted upon accordingly.' " <u>Hall</u>, 245 F.2d at 341. Although the second circuit found the trial court's subsequent comments improper, it noted in *dicta* there would be no substantial basis for a claim had the trial court concluded with its initial response that instructed the jury it could recommend leniency but sentencing was the function of the court. <u>Hall</u>, 245 F.2d at 341; see also <u>United States v. Glick</u>, 463 F.2d 491, 494 (2d Cir. 1972).

The defendant in <u>United States v. Jackson</u>, 470 F.2d 684, 685 (5th Cir. 1972), had been charged with several counts of counterfeiting. During its deliberations, the jury asked the court whether leniency would be permissible in view of the defendant's unblemished record. <u>Jackson</u>, 470 F.2d at 687. The trial judge answered the jury by saying:

> " 'THE COURT: Ladies and gentlemen of the jury, I have received your
> note, which is, in effect, is leniency, or a finding in favor of leniency in the case
> of guilt proper. The answer is no.

That is the Judge's function.  It is up to me to determine whether leniency should be granted in the case of a conviction.

The only thing you could possibly do is recommend to the Court, if you find the man guilty, that the Court be lenient with the defendant on account of his youth and previous reputation.  That is all.  You can send that note, and that is all.

By the way, I wish you could find all the defendants guilty, and punish them, and everything else.  That would relieve me of quite a bit of work.  That is not the law, however.  The law is that the Court instructs the jury to find the man guilty or not guilty; and then the Court must finally grant leniency if, in the Court's opinion, leniency is justified.' "  Jackson, 470 F.2d at 687.

The jury returned a verdict of guilty.  Jackson, 470 F.2d at 688.  The defendant challenged the trial court's response to the jury on appeal.  Jackson, 470 F.2d at 688.  The Fifth Circuit held the trial court correctly told the jury it could recommend leniency but that it was the function of the court, not that of the jury, to make the ultimate decision with respect to punishment.  Jackson, 470 F.2d at 688.  The court noted that "[i]n extreme circumstances, where a jury is hopelessly deadlocked, an instruction by the court that the jury may recommend leniency can be so conducive to a compromise verdict as to be reversible error."  Jackson, 470 F.2d at 688.  The court cited a case where the jury had been deliberating for several days before the jury was told it could recommend leniency.  Jackson, 470 F.2d at 688, citing United States v. Davidson, 367 F.2d 60 (6th Cir. 1966).  Because there was no evidence in that case of a jury deadlock or other special circumstances, the court held the trial court's response to the jury did not induce it to return a verdict of guilty.  Jackson, 470 F.2d at 688.

19

We agree with federal jurisprudence on the area of leniency recommendations by a jury. We conclude a jury that requests during its deliberations whether it may recommend leniency toward a defendant can be answered in the affirmative as long as the trial judge makes it clear to the jurors that they are powerless to decide leniency because it is the sole function of the trial court to fashion an appropriate punishment if the defendant is found guilty. The cases reviewed suggest that only in extreme circumstances where the record strongly suggests the court's admonishment resulted in a compromise verdict will the verdict be held invalid.

There were no such circumstances here. The record shows the jury did not deliberate for long before sending its request to the trial judge. There is nothing to suggest the jury was deadlocked or that it relied on the trial court's response in entering its verdict. Because we find the trial court's response to the jury proper and no evidence that the jury reached a compromise verdict, we will not reverse defendant's conviction on this ground.

Defendant's final argument on appeal concerns the State's implication during its opening and closing arguments that defendant's motive was related to gang activity. Defendant concedes he waived the issue for review by failing to make a timely objection at trial. But defendant requests we review the issue under the plain error doctrine. "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either[:] (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." People v. Herron, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467 (2005). In the first instance, the defendant must show there was plain error and the "evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." Herron, 215 Ill. 2d at 187. In the second instance, the defendant must

show there was plain error and the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. Herron, 215 Ill. 2d at 187. Defendant here argues plain error under both theories.

We first address whether the evidence was so close as to render an alleged error prejudicial. We conclude the evidence was strongly weighed against defendant. Defendant admitted he drove the car that was involved in the shooting. Although he denied actually firing a gun or knowing his passengers were armed and had criminal intent, he admitted returning to the scene after an initial round of gun shots had been fired and slowing his car while a second round was in progress. This evidence left little doubt of defendant's guilt.

We next address whether the alleged error was so serious it affected the fairness of defendant's trial and challenged the integrity of the judicial process. The purpose of a prosecutor's opening argument is to apprise the jury of what the prosecution intends in good faith to prove through evidence at trial. People v. Flax, 255 Ill. App. 3d 103, 108, 627 N.E.2d 359 (1993). Although it is improper to mention matters the prosecution knows will not be proved during the trial, an improper remark during an opening statement will not be grounds for reversal unless it resulted in substantial prejudice to the defendant. Flax, 255 Ill. App. 3d at 108-09. The purpose of a closing argument, on the other hand, is to give the parties an opportunity to review the evidence with the jury. People v. Pierce, 223 Ill. App. 3d 423, 440, 585 N.E.2d 255 (1991y). Prosecutors are allowed great latitude in making closing arguments and may comment on the evidence and all inferences reasonably yielded by the evidence. People v. Blue, 189 Ill. 2d 99, 127, 724 N.E.2d 920 (2000). Argument that serves no purpose but to inflame the jury constitutes error. Blue, 189 Ill. 2d at 128.

21

The comments made by the State here were not improper. The evidence showed PJ, Little Hawk and Derrick were members of the Black Souls street gang. Defendant admitted having knowledge of their membership in this gang. He also admitted driving into Gangster Disciple territory when the shooting took place. It is reasonable to infer defendant, who was not a gang member, was motivated to act in concert with the others to gain favor with the Black Souls. The State's comments implying defendant shared a gang-related motive with P.J., Little Hawk and Derrick were not improper. See People v. Toney, 337 Ill. App. 3d 122, 148, 785 N.E.2d 138 (2003) (prosecution may comment on gang activity when the crime is related to gang rivalry). Without an error, there can be no plain error review.

The judgment of the circuit court is affirmed.

Affirmed.

GORDON and BURKE, JJ., concur.